**THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **JOSHUA CACHO,** | § |
| | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **INSURANCE SUPERMARKET INC.,** a | § |
| Delaware Corporation, and **EMC NATIONAL** | § |
| **LIFE COMPANY,** an Iowa Corporation | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| **Defendants.** | § |
| | § |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**PARTIES**

1.      The Plaintiff is JOSHUA CACHO ("Plaintiff") a natural person, resident of the Middle

District of Florida, and was present in Florida for all calls, in this case in Seminole County,

Florida.

2.      Defendant INSURANCE SUPERMARKET INC. ("ISI") is a corporation organized and

existing under the laws of Delaware with its principal address at 1951 Northwest 7th Avenue,

600, Miami, Florida 33136.  ISI is a registered foreign corporation in Florida and can be served

via registered agent Shawn Kehoe at 1951 Northwest 7th Avenue, 600, Miami, Florida 33136.

3.      Defendant EMC NATIONAL LIFE COMPANY ("EMC") is a corporation organized and

existing under the laws of Iowa with its principal address at 699 Walnut Street, Suite 1100, Des

Moines, Iowa 50309.  EMC is a registered foreign corporation in Florida and can be served via

1

registered agent Chief Financial Officer at 200 E. Gaines Street, Tallahassee, Florida 32399.

4.      Defendants ISI and EMC are hereinafter collectively referred together as "Defendants".

## JURISDICTION AND VENUE

5.      Jurisdiction.  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow*

*Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

## PERSONAL JURISDICTION

6.      This Court has general personal jurisdiction over the Defendants because they have

repeatedly placed calls to Florida residents, and derived revenue from Florida residents, and they

sell goods and services to Florida residents, including the Plaintiff.  Defendant ISI has a principal

place of business in the State of Florida and specifically in this District.

7.      Defendants maintain sufficient minimum contacts with this District, have purposefully

availed themselves of the privilege of doing business in this District, maintain registered agents

in Florida, and possess such significant and continuous presence in this District as to be subject

to the personal jurisdiction of this Court.

## VENUE

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a

substantial part of the events giving rise to the claims—the calls and sale of goods and services

directed at Florida residents, including the Plaintiff—occurred in this District and because the

Plaintiff resides in this District.

9.      This Court has venue over Defendants because the calls at issue were sent by or on behalf

of Defendant ISI at the authorization of Defendant EMC to Plaintiff, a Florida resident.

## THE TELEPHONE CONSUMER PROTECTION ACT

2

**OF 1991, 47 U.S.C. § 227**

10.    In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

11.    The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

12.    The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

13.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

14.    Separately, the TCPA bans telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

15.    The TCPA provides a private cause of action to persons who receive calls in violation of

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

3

§ 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

16.     According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

17.     The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

18.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

19.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

20.     The FCC confirmed this principle in 2013, when it explained that "a seller ... may be held vicariously liable under federal common law principles of agency for violations of either

4

section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

21.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

22.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

## FACTUAL ALLEGATIONS

23.     Plaintiff's personal cell phone (407) 577-3881 has been registered on the National Do-Not-Call Registry since July 2, 2021.

24.     Plaintiff never asked the National Do-Not-Call Registry administrator to remove him from the National Do-Not-Call Registry and Plaintiff was on the National Do-Not-Call Registry at all times relevant to this Complaint.

25.     Defendant ISI works as a "broker" for Defendant EMC.

26.     Defendant ISI hires and authorizes telemarketers to make illegal robocalls to thousands of consumers *en masse* using an ATDS with prerecorded voice messages to solicit Defendant EMC's life insurance policies.

27.     Defendant ISI approves of the contracts with these telemarketers.

28.    Defendant ISI pays the telemarketers out of bank accounts they own and control.

29.    Defendant ISI approves of the robocall scripts their telemarketers use when making

unauthorized phone calls to consumers soliciting Defendant EMC's life insurance policies that

state,

"Hi this is Mary with senior benefits how are you doing today actually I'm calling to inform you
about a state-regulated final expense program what's your age who do you have in mind as a
beneficiary how's your health do you take any medications these programs are designed for
families that are on a fixed income such as social security and disability to get you to qualified
I'll connect you to a local agent okay"

30.    Defendant EMC is well aware that Defendant ISI hires third-party telemarketers to make

illegal robocalls to thousands of consumers soliciting their life insurance policies.

31.    Each and every time Defendant ISI sells a life insurance policy to a consumer from

Defendant EMC it benefits both Defendants financially.

32.    Defendants knowingly and willfully violate the TCPA because doing so benefits them

financially when consumers purchase their life insurance policies.

33.    Plaintiff received at least four (4) robocalls to his personal cell phone 3881 from third-

party telemarketers calling on behalf of Defendants within a two-day period.

34.    With information and belief Plaintiff has received more phone calls from or on behalf of

Defendants within the past two years and the true number of calls will be revealed during

discovery.

35.    Defendant ISI has previously been sued for violating the TCPA *Kemp v. Insurance*

*Supermarket Inc.* 1:22-cv-21529-FAM (S.D.FL., May 17, 2022) and continues to violate the law

because doing so benefits them financially.

36.    Defendant EMC is aware of Defendant ISI's illegal behavior however continues to allow

them to sell life insurance policies on behalf of Defendant EMC because it benefits them

6

financially.

37.     Plaintiff was bombarded and harassed at least four (4) times by third-party telemarketers soliciting life insurance policies on behalf of Defendants.

38.     Each and every phone call Plaintiff received from the telemarketers calling on behalf of Defendants started with the same prerecorded voice message "Hi this is Mary with senior benefits."

39.     On July 20, 2022, at 5:45 PM Plaintiff received one of five phone calls to his personal cell phone from a telemarketer calling on behalf of Defendants.

40.     Plaintiff answered there was a 3-4 second delay followed by a beep before being connected to prerecorded voice message "Hi this is Mary with senior benefits."

41.     Plaintiff was extremely aggravated and frustrated for receiving the same phone call multiple times in the same day and followed the prompts for the sole purpose of identifying the companies responsible for illegal robocalls.

42.     Plaintiff was then transferred to a telemarketer named Daniel who falsely identified the company he was calling on behalf of "American Benefits" in violation of Florida Statute Title XXXIII Regulation of Trade, Commerce, Investments, and Solicitations 501.059(8)(b) and 47 C.F.R. 64.1200(d)(4).

43.     Daniel advised Plaintiff that the phone call was in regard to a final expense insurance program that covers funeral, burial, cremation, or any other final expenses.

44.     Daniel then asked Plaintiff qualifying questions and solicited Plaintiff for a life insurance policy on behalf of Defendants.

45.     Plaintiff did not want or need a life insurance policy however advised Daniel he did for the sole purpose of identifying the company responsible for the illegal robocalls.

7

46.     Daniel then asked for Plaintiff's name confirming the phone call was made using an ATDS and was not made directly to Plaintiff as the phone call could've reached anyone in the United States.

47.     Daniel then advised Plaintiff he was going to be connecting Plaintiff to one of his state licensed agents who will provide the benefits of the life insurance coverage.

48.     Daniel then transferred Plaintiff to a representative named Susan that stated she was with Defendant ISI.

49.     Susan then confirmed Plaintiff's information, asked him qualifying questions, and solicited him for a life insurance policy on behalf of Defendants.

50.     Susan then advised Plaintiff she was going to transfer him to an "advisor" in his state that will discuss how much coverage he qualifies for.

51.     Plaintiff was then transferred to a representative named Shaun Eddy who said he was a senior advisor from Defendant ISI.

52.     Shaun advised Plaintiff their main office is in Florida, but he is out in the Salt Lake, Utah area and then stated,

 "We do have people who do make a lot of phone calls but we do have our main call center there in Florida and yes we have a pretty diverse man people who call"

53.     Shaun advised Plaintiff that they are a "broker" company for a number of top US life insurance companies and their part in the program is to help consumers find the best rates.

54.     Shaun then asked Plaintiff a series of healthcare questions and solicited Plaintiff for a life insurance policy on behalf of Defendant EMC.

55.     Shaun advised Plaintiff the cost of the life insurance policy is $83.20 per month.

56.     Plaintiff received an email from Shaun from shaun.eddy@insurance-supermarket.com

that contained Plaintiff's life insurance policy and revealed the information of the companies

responsible for the illegal robocalls. *See "Exhibit A."*

57.     Plaintiff did not ask Defendants to call him regarding life insurance.

58.     Plaintiff did not seek Defendant's phone calls or services at any time before, during, or

after the phone calls alleged in this Complaint.

59.     Table below displays the calls made to Plaintiff from or on behalf of Defendants.

TABLE A

| Number: | Date | Time | Caller ID | Notes |
|---------|------|------|-----------|-------|
| 1 | 07/19/2022 | 10:33 AM | 407-559-1134 | Mary senior benefits pre-recorded voice message |
| 2 | 07/20/2022 | 11:12 AM | 407-589-1985 | Mary senior benefits pre-recorded voice message |
| 3 | 07/20/2022 | 5:05 PM | 859-305-8081 | Mary senior benefits pre-recorded voice message |
| 4 | 07/20/2022 | 5:45 PM | 407-592-5112 | Mary senior benefits pre-recorded voice message spoke with Susan and Shaun purchased policy. |

60.     Defendants' telemarketers initiated numerous unsolicited robocalls and made unlawful

telemarketing sales pitches regarding life insurance policies.

61.     No emergency necessitated none of the alleged phone calls.

62.     Plaintiff sent an internal do-not-call policy request to Defendant ISI to email

info@insurance-supermarket.com on July 23, 2022, which is an email listed on the website they

own and control https://insurance-supermarket.com.

63.     Plaintiff sent an internal do-not-call policy request to Defendant EMC to email

help@emcnl.com on July 23, 2022 which is an email listed on their website they own and

control https://emcnationallife.com.

64.     Despite these emails, Defendants failed and/or refused to send Plaintiff a do-not-call

policy.

65.     Upon information and belief, the Defendants did not have a written do-not-call policy

while it was sending Plaintiff the illegal robocalls.

66.     Upon information and belief, the Defendants did not train their agents who engaged in

telemarketing on the existence and use of any do-not-call list.

67.     Such conduct violates the TCPA and its implementing regulations, 47 CFR §

64.1200(d)(3)(requiring telemarketers to honor and record DNC requests when made).

68.     Plaintiff has limited data storage capacity on his cellular telephone. Incoming

telemarketing calls consumed part of this capacity.

**VICARIOUS LIABILITY OF DEFENDANTS ISI AND EMC**

69.     Defendants are vicariously liable for the telemarketing calls that generated the lead on

their behalf.

70.     The FCC is tasked with promulgating rules and orders related to enforcement of the

TCPA. 47 U.S.C. § 227(b)(2).

71.     The FCC has explained that its "rules generally establish that the party on whose behalf a

solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations*

*Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13

(1995).

72.     The FCC reiterated that a company on whose behalf a telephone call is made bears the

responsibility for any violations. *In re Rules and Regulations Implementing the Telephone*

*Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

73.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

74.     More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

75.     The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

76.     To the contrary, the FCC—armed with extensive data about robocalls and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's

11

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

77.     Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

78.     Defendants are legally responsible for ensuring that the affiliates that make telemarketing calls on their behalf comply with the TCPA when so doing.

79.     Defendants knowingly and actively accepted business that originated through illegal telemarketing.

80.     Defendants knew (or reasonably should have known) that their telemarketer was violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketer to cease that conduct.

81.     By hiring a company to make calls on their behalf, Defendants "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

82.     Moreover, Defendants maintained interim control over the actions of its telemarketers.

83.     For example, Defendants had absolute control over whether, and under what circumstances, they would accept a customer from its telemarketers.

84.     Furthermore, Defendants had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS with prerecorded messages to contact potential customers of Defendants and the ability to require them to respect the National Do Not Call Registry.

85.     Defendants also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

86.     Defendants donned its telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched "life insurance" policies in the abstract.

87.     Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

88.     "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

89.     A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

90.     Defendants' telemarketers transferred customer information, including Plaintiff's contact information, directly to Defendant ISI. Thus, the telemarketer had the "ability . . . to enter consumer information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

91.     Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a

reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

92.    Defendants are the liable party as the direct beneficiary of the illegal telemarketing robocalls as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for life insurance policies on their behalf.

## INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
## AS A RESULT OF THE CALLS

93.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

94.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

95.    Defendants' calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

96.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of my cell phone.

### Plaintiff's cell phone is a residential number

97.    The calls were to Plaintiff's cellular phone 3881 which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

## CAUSES OF ACTION:

### COUNT ONE:
### Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by Automated Telemarketing Without Prior Express Written Consent

98.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

99.    Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), at least four (4) times by placing non-emergency telemarketing calls to Plaintiff's cellular telephone number using an automatic telephone dialing system with a prerecorded voice without prior express written consent.

100.   Plaintiff was statutorily damaged at least four (4) times under 47 U.S.C. § 227(b)(3)(B) by Defendants by the telephone calls described above, in the amount of $500.00 per call.

101.   Plaintiff was further statutorily damaged because Defendants willfully or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount to $1,500.00 as permitted under U.S.C. § 227(b)(3)(C) for each and every willful and/or knowing violation.

102.   Plaintiff is also entitled to and does seek an injunction prohibiting Defendants and their affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), by placing non-emergency telemarketing calls to any cellular telephone number using an ATDS with a prerecorded message and/or without prior express written consent.

## COUNT TWO:

### (Violation of the TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c), and 47 C.F.R. § 64.1200(C))

103.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

104.    Defendants called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

105.    Plaintiff was statutorily damaged at least four (4) times under 47 U.S.C. § 227(c)(3)(F) by Defendants by the telemarketing calls described above, in the amount of $500.00 per call.

106.    Plaintiff was further statutorily damaged because Defendants willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

107.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## COUNT THREE:

### Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d)

### (Against All Defendants)

108.    Plaintiff incorporates the forgoing allegations as if fully set forth herein.

109.         The foregoing acts and omissions of Defendants and/or their affiliates or

agents constitute multiple violations of FCC regulations by making telemarketing

solicitations despite lacking the following:

   a.  A written policy, available upon demand, for maintaining a do-not-call list, in

       violation of 47 C.F.R. § 64.1200(d)(1) [2];

   b.  Training for the individuals involved in the telemarketing on the existence of and

       use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2) [3]; and,

   c.  In the solicitations, the name of the individual caller and the name of the person or

       entity on whose behalf the call is being made, in violation of 47 C.F.R. §

       64.1200(d)(4).[4]

110.   Plaintiff is entitled to an award of at least $500 in damages for each such violation. 47

U.S.C. § 227(c)(5)(B).

111.   Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or

willful violation. 47 U.S.C. § 227(c)(5).

### PRAYER FOR RELIEF

       WHEREFORE, Plaintiff Joshua Cacho prays for judgment against the defendants jointly

and severally as follows:

   A.  Leave to amend this Complaint to name additional DOESs as they are identified and to

   conform to the evidence presented at trial;

   B.  A declaration that actions complained of herein by Defendants violate the TCPA law;

---

[2] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[3] *See id.* at 425 (codifying a June 26, 2003 FCC order).

[4] *See id.* at 425 (codifying a June 26, 2003 FCC order

C.  An award of $1500 per call in statutory damages arising from the TCPA §227(b) intentional violations jointly and severally against the corporations for 4 calls.

D.  An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporations for 4 calls.

E.  An award to Plaintiff of damages, as allowed by law under the TCPA;

F.  An award to Plaintiff of interest, costs and attorneys' fees, as allowed by law and equity.

G.  Such further relief as the Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

July 27, 2022,                                          Respectfully submitted,

Joshua Cacho
Plaintiff, Pro Se
164 Estella Road
Lake Mary, Florida 32746
407-577-3881